## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DEQUAVIOUS JOHNSON,

                Petitioner,             Case Number: 2:11-cv-11891

v.                                  HONORABLE GERALD E. ROSEN

CINDI CURTIN,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY

Michigan state prisoner, Dequavious Johnson, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, who is currently incarcerated at the Oaks Correctional Facility in Manistee, Michigan, challenges his convictions for first-degree premeditated murder, conspiracy to commit murder, three counts of assault with intent to murder, two counts of intentional discharge of a firearm from a motor vehicle, carrying a concealed weapon, and seven counts of felony firearm. The Court denies the petition.

### I. Facts

The Michigan Court of Appeals provided a comprehensive and detailed factual overview of the case, which is presumed correct on habeas review, *see Monroe v. Smith*, 197 F. Supp. 2d 753, 758 (E.D. Mich. 2001), aff'd. 41 F. App'x 730 (6th Cir. 2002), as follows:

A.  Overview

This case stems from a series of shootings that involve multiple victims, including an infant, Stacy Evans, Jr., who was shot and killed while riding in his car seat.  At the outset, we note that this series of shootings was both shockingly callous and exceedingly dangerous.  The studied indifference of the young men involved to the threat of death their behavior caused is truly astonishing.  In order to place this behavior in context, we set out the facts below at some length.

B.  The Basketball Game Fight And Its Aftermath

According to Cameron Evans, on March 2, 2007, he and his brother Malcolm Evans were at the home of Jerry Long, shooting dice with a number of others for money and smoking marijuana.  Eventually, Johnson, Jhirnea Harris, Shaquille Harris, and Daviaro Barrera arrived.  Cameron Evans, who was granted immunity for his trial testimony, stated that he knew Johnson from their time in eighth grade, about a year before.  Cameron Evans reported that at some point Jhirnea Harris left to go to a basketball game at Saginaw High School.

We note that there was evidence that all three of the subsequent shootings occurred after a fight, between persons from different parts of the Saginaw area, at this basketball game.  There was evidence of tension between residents from these different areas of town.  For example, Barretta Epperson stated that she was living on the north side of Saginaw when her son Stacy Evans, Jr. was killed and that her companion Joseph Ball lived in Buena Vista, which has had a rivalry with the north side.  Barretta Epperson also thought that there was tension between people from the north side and the south side, or sunnyside, and she noted that the phrase "sunny bitch" was subsequently carved into her car.

Perhaps because of this rivalry and immediately before the varsity basketball game at the school, Jhirnea Harris and Cruz Hinds got into a fight on the gym floor.  Hinds testified that Jhirnea Harris approached him and head-butted him without saying anything, and the fight followed.  Cruz Hinds said that he lived in the south side of Saginaw and felt uncomfortable for safety reasons on the north side, where Jhirnea Harris lived.  Jhirnea Harris, aged 18 as of trial and a life long close friend of Johnson, testified that the fight with Cruz Hinds was a misunderstanding; we note that Jhirnea Harris pleaded guilty to a number of crimes stemming from the incidents of

2

that night, including second-degree murder.  Cruz Hinds and Jhirnea Harris were escorted off the property and did not return to the gym. Cruz Hinds said that he then called his sister to pick him up and spent the rest of the night at home with a headache, a headache that may have saved his life.

## C.  The Van Shooting

Cameron Evans stated that when Jhirnea Harris returned to Jerry Long's house, he was angry and wanted to go back to the game.  Shaquille Harris, who was 15 years old at the time of trial and who pleaded guilty to assault with intent to murder in exchange for his trial testimony, said that Jhirnea Harris asked his group of friends to return to the basketball game to fight.  Cameron Evans stated that they eventually left to go back to the basketball game in Jerry Long's Hummer, which had front-end damage.  Cameron Evans said that Jerry Long drove, Johnson sat in the front seat, and he, Jhirnea Harris, and Shaquille Harris sat in the back.

According to Cameron Evans, when they saw that the basketball game was still in progress, they went to Cass River Market because Shaquille Harris wanted to purchase bullets.  Shaquille Harris acknowledged that he had a .22–caliber gun that he was trying to buy bullets for at the store.  After Shaquille Harris was unable to buy the ammunition, Jerry Long purchased some .22 caliber bullets.  Ghadeer Ibrahim, who owns Cass River Market with her husband, testified that her husband refused to sell bullets to some teenagers on March 2, 2007, but that an adult purchased bullets shortly after the teens left.  Ibrahim could not identify any of the men.

Cameron Evans stated that after they left the store, Jhirnea Harris thought that he saw Cruz Hinds walking on the street. Shaquille Harris also recalled Jhirnea Harris stating that he saw a person who looked like Cruz Hinds walking. Shaquille Harris testified that Jhirnea Harris asked Johnson for a gun, and Cameron Evans stated that Johnson produced a gun, gave it to Jhirnea Harris, and then "racked" it for him. Jhirnea Harris, however, stated that he always had the gun he shot with and that Johnson did not offer to help him load it.

Cameron Evans recounted that Jhirnea Harris then got out of the truck and shortly returned, saying he had spotted someone hiding under a van. Cameron Evans stated that Jhirnea Harris began shooting under the van and through its windshield.  Cameron Evans saw Jhirnea Harris shoot 20 to 30 times through and under the van.  According to Cameron Evans and

Shaquille Harris, when Jhirnea Harris returned, he said that he was shooting at Devonte Barnes and that, if he did not shoot him, they should shoot him when they returned to "the city," described as being a specific neighborhood in Saginaw.

Devonte Barnes testified that he lived on the south side of Saginaw. Devonte Barnes stated that on the night of the shootings he attempted to hide behind a van, but that a man with a gun approached him and started shooting. Devonte Barnes said that he escaped by jumping a fence and running to a nearby house. Saginaw Police Officer Mark Scott responded to the van shooting and found 13 bullet holes in the hood, front windshield, and driver's side windows. Officer Scott also found bullet holes in a garage near the van. In all, Officer Scott found 19 shell casings at the scene of the van shooting and Buena Vista Township Police Detective Kevin Kratz stated that three more casings were later located at the scene.

### D.  The South Side Shooting

Cameron Evans stated that the gun was now empty, so they drove to Johnson's home and got more bullets. Shaquille Harris also recalled stopping at Johnson's home, where Johnson obtained more bullets from another man standing outside the home. Jhirnea Harris, however, stated that he lied when he said during his guilty plea that they got ammunition to reload the gun from Johnson's house.

Cameron Evans said that after they got more ammunition, the group went back to Jerry Long's house, and Jhirnea Harris re-loaded the gun, helped along by suggestions from Johnson about how to order the bullets. Johnson also helped Shaquille Harris load a gun with the .22 caliber bullets from the Cass River Market. Cameron testified that Shaquille Harris put the .22 caliber gun with a blue rag attached in his pocket and that another gun was sitting on a stool in the room as they played dice and smoked marijuana. Daviaro Barrera also arrived at the Long home about this time. Eventually, the group drove back to Saginaw High School, but saw that the basketball game was over. Jhirnea Harris, however, denied going back to the school, stating that the second trip was back to the south side of Saginaw.

Shaquille Harris stated that the group was driving around looking for somebody who might be out on the street, and Cameron Evans confirmed that the purpose of the driving was to find people to shoot. Cameron Evans reported that Jerry Long slowed as they drove by a south side home, and

4

Daviaro Barrera leaned over Shaquille Harris and Jhirnea Harris to shoot at some people on the porch of that home. Cameron Evans described loud shots inside the vehicle with used shells flying around the car and the smell of gunpowder. Shaquille Harris also recalled Daviaro Barrera shooting out the window at someone on a porch. Cameron Evans stated that he believed that Daviaro Barrera shot with a MAC 11 gun that belonged to Johnson. Cameron Evans believed that the gun was Johnson's because it was the same gun Johnson pulled out of his pants and set on a stool during the dice game at the Long home. Cameron Evans thought that Daviaro Barrera shot four or five times and that the target shot back. However, Jhirnea Harris stated that he shot at the people on the porch, rather than Daviaro Barrera as he testified to during his plea. Jhirnea Harris stated that he wanted to scare, rather than kill, the people on the porch.

### E. The Stacy Evans, Jr. Shooting

Cameron Evan stated that after stopping at another store, they were driving home when Daviaro Barrera saw Joseph Ball, who was the boyfriend of Barretta Epperson. As noted previously, Barretta Epperson is the mother of shooting victim Stacy Evans, Jr. Shaquille Harris also remembered Daviaro Barrera identifying Joseph Ball as Ball came out of a house.

Barretta Epperson testified that she was sitting in a car in her driveway at about 10:30 p.m. on March 2, 2007, while Joseph Ball was bringing his clothes back from her home. Barretta Epperson stated that she had the light on inside the car and was attempting to give her son a bottle. Joseph Ball stated that he made two trips from the house to the car. Barretta Epperson testified that she noticed a Hummer with damage to the front driver's side at the street corner, and Joseph Ball stated that he noticed the Hummer standing at a stop sign near the home the first time he placed a bag in the car. Barretta Epperson testified that the Hummer followed along with them as she drove Joseph Ball and her son away from the residence. Barretta Epperson was in the driver's seat, Joseph Ball was beside her, and the infant was behind Joseph Ball in a car seat in the back. Cameron Evans said that Daviaro Barrera asked Jerry Long to follow the car, and they drove fast to catch up to it.

Joseph Ball stated that they drove a block before the Hummer pulled up behind them. Cameron Evans testified that when Joseph Ball's car turned, Johnson rolled down his window and asked Daviaro Barrera if he should shoot. Cameron Evans stated that Daviaro Barrera then told Johnson to

shoot and that Johnson shot 10 or 11 times from the front seat of the Hummer.  Cameron Evans did not know, however, if Johnson aimed the gun.  Shaquille Harris stated that when Joseph Ball's car turned, Daviaro Barrera gave the gun to Johnson who started shooting out the window at Daviaro Barrera's command.  Shaquille Harris said that Johnson hesitated at first and asked Daviaro Barrera if he should shoot before he began shooting at the car.

Barretta Epperson testified that they heard shots fired and heard two or three shots hitting a road sign. Joseph Ball thought that he heard around 10 total shots fired at them. Joseph Ball stated that the Hummer followed them around the corner, shot, and then turned onto another street.  Joseph Ball said that he heard a shot hitting the car.  Barretta Epperson stated she did not see the shooter, but it was just her car and the Hummer behind her on the road in an area of abandoned houses.  Joseph Ball also said that the Hummer was the only other vehicle in the area.

According to Barretta Epperson, when the shooting stopped, she saw that her son had been shot while in his car seat, and she drove to the hospital.

Once back at the Long home, Shaquille Harris heard a call on a cell phone that Barretta Epperson's baby was shot.  Shaquille Harris stated that he and his brother Jhirnea Harris left with Johnson.  Cameron Evans reported that they went back to the Long home where Johnson gave the gun to Jhirnea Harris.

Buena Vista Township Police Officer Tim Patterson responded to a call about the shooting of a one-year-old male and went to the hospital on March 2, 2007.  When Officer Patterson arrived at the hospital, he encountered Barretta Epperson's car empty and running outside the emergency room.  He noted a bullet hole just above a child seat in the rear of the vehicle and what looked like blood in the seat.  Joseph Ball also stated that he saw a bullet hole that entered the car at the taillight.

At the hospital, Officer Patterson spoke to Joseph Ball and Barretta Epperson, both of whom described the Hummer. Barretta Epperson also identified Daviaro Barrera as someone who may have been involved in the Stacy Evans, Jr. shooting.  Officer Patterson later found Joseph Ball in the parking lot of the hospital arguing with the Evans family, who were saying that it was Joseph Ball's fault that the Stacy Evans, Jr. shooting occurred.  Barretta Epperson testified that she later saw that "sunny bitch" was carved

into her car.  Cameron Evans, along with his brother Malcolm Evans and his mother, went to talk to the police a few days later after Malcolm Evans was wrongly identified as being in the Hummer on the night of the Stacy Evans, Jr. shooting.

Kanu Virani, M.D. was the medical examiner that performed the autopsy on the infant Stacy Evans, Jr.  Dr. Virani stated that the infant had a gunshot wound on the top left part of his head that traveled straight through his brain to the top part of his nose. Dr. Virani's opinion was that the infant had no way of surviving the gunshot.  Buena Vista Township Police Sergeant Sean Waterman also attended the autopsy and recovered a nine-millimeter bullet from the body of the infant.

Detective Kratz testified that he collected 11 shell casings and one fired bullet at the location of the Stacy Evans, Jr. shooting.  Michigan State Police Detective Lieutenant Ronald Crichton collected a used bullet casing from the Hummer.  Detective Crichton demonstrated the path of the bullet that struck the rear of Barretta Epperson's car and then the infant.  Detective Crichton stated that all bullet casings that he examined were fired from the same gun and Detective Kratz stated that ballistic evidence found in the Hummer matched that ballistic evidence that he had from the scene of the Stacy Evans, Jr. shooting.

*People v. Johnson*, No. 285888, 2009 WL 3931057 at *3-4 (Mich. Ct. App.  Nov. 19, 2009).

## II.  Procedural History

Petitioner was convicted by a jury in Saginaw County Circuit Court of first-degree murder, conspiracy to commit first-degree murder, three counts of assault with intent to murder, two counts of intentionally discharging a firearm from a motor vehicle, carrying a concealed weapon (CCW), and seven counts of possession of a firearm during the commission of a felony.  On May 15, 2008, the trial court sentenced him to life in prison for the first-degree murder and conspiracy convictions, 285 months to 40 years in prison

for each of the assault with intent to commit murder convictions, 38 to 60 months in prison for the CCW conviction, 24 to 48 months in prison for each intentional discharge of a firearm from a motor vehicle conviction, and two years in prison for each of the felony-firearm convictions.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising these claims:

I. Petitioner was denied due process of law where he was convicted of premeditated murder, yet the evidence at trial was insufficient to prove that he intended to kill the murder victim or anyone else.

II. Petitioner was denied due process of law where he was convicted of assault with intent to murder Barretta Epperson, yet the evidence at the trial was insufficient to prove beyond a reasonable doubt that he intended to kill her.

III. Petitioner was denied due process of law where he was convicted of assault with intent to murder Joseph Ball, yet the evidence at the trial was insufficient to prove beyond a reasonable doubt that he intended to kill him.

IV. Petitioner was denied due process of law where he was convicted of assault with intent to murder Davonte Barnes, yet the evidence at the trial was insufficient to prove beyond a reasonable doubt that Jhirnea Harris intended to kill him.

V. Petitioner was denied due process of law where he was convicted of conspiracy to commit murder where the evidence at trial was insufficient to prove beyond a reasonable doubt that he intended that anyone be killed.

VI. The trial court erred when it precluded defense counsel from asking jurors their occupation during voir dire.

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Johnson*, No. 285888, 2009 WL 3931057 (Mich. Ct. App. Nov. 19, 2009).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court,

raising the same claims raised in the Michigan Court of Appeals.  The Michigan Supreme

Court denied leave to appeal.  *People v. Johnson*, 486 Mich. 902 (Mich. Apr. 27, 2010).

Petitioner then filed the pending habeas petition.  He raises the same claims raised

in state court.

### III.  Standard

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to
any claim that was adjudicated on the merits in State court proceedings
unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as determined
by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the State
court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a

rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

'confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"

*Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000)).  "[T]he 'unreasonable application' prong of the statute

permits a federal habeas court to 'grant the writ if the state court identifies the correct

governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 789 (2011), (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams,* 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme

Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007), *citing Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

Lastly, a federal habeas court must presume the correctness of state court factual determinations.  See 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption only with clear and convincing evidence.  *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

11

## IV.  Discussion

### A.  Sufficiency of the Evidence

Petitioner's first five habeas claims relate to the sufficiency of the evidence

presented.  He argues that insufficient evidence was presented to sustain his convictions

for premeditated murder, assault with intent to murder Barretta Epperson, Joseph Ball,

and Davonte Barnes, and conspiracy to commit murder.

"[T]he Due Process Clause protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with

which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  On direct review, review

of a sufficiency of the evidence challenge must focus on whether "after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.*

*Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original).  In the habeas context, "[t]he

*Jackson* standard must be applied 'with explicit reference to the substantive elements of

the criminal offense as defined by state law.'"  *Brown v. Palmer*, 441 F.3d 347, 351 (6th

Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

"Two layers of deference apply to habeas claims challenging evidentiary

sufficiency."  *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010), *citing Brown v.*

*Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)).  First, the Court "must determine whether,

viewing the trial testimony and exhibits in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a

12

reasonable doubt." *Brown*, 567 F.3d at 205, *citing Jackson,* 443 U.S. at 319.  Second, if

the Court were "to conclude that a rational trier of fact could not have found a petitioner

guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the

state appellate court's sufficiency determination as long as it is not unreasonable." *Id.*

### 1.    **Premeditated Murder – Stacy Evans, Jr.**

In the final shooting of the night, one-year old Stacy Evans, Jr., was struck and

killed while seated in an infant car seat in Joseph Ball's vehicle.  Petitioner claims that

insufficient evidence was presented to sustain his conviction for the first-degree

premeditated murder of Evans.  Under Michigan law, "[in] order to convict a defendant of

first-degree murder, the prosecution must prove that the defendant intentionally killed the

victim and that the killing was premeditated and deliberate."  *People v. Anderson*, 531

N.W.2d 780, 786 (Mich. Ct. App. 1995).  Premeditation may be inferred by the

circumstances surrounding the killing.  *People v. Marsack,* 586 N.W.2d 234, 371 (Mich.

Ct. App. 1998).

Petitioner argues that the state did not establish the requisite intent to kill because

he fired in the vicinity of the vehicle only with the intention of scaring Epperson and Ball,

not with the intent to kill someone.  He also argues that the fact that 11 spent shell casings

were found at the scene, but only 1 bullet struck the vehicle proves that he was not

intending to strike the car.  The Michigan Court of Appeals rejected these arguments. The

state court reasoned  it was equally plausible that the fact that one bullet struck the car

showed that Petitioner intended to strike the car.  The state court also noted that the feud

13

that preceded the shooting provided a motive for the shooting.  The Michigan Court of Appeals concluded that the severity of the baby's injuries and the use of a dangerous weapon evidenced an intent to kill; and, even if the baby was not the intended target, under Michigan law, the intent to kill a person may be transferred from the intended victim to the actual victim.  *Stephenson*, 2009 WL 3931057 at *5-6.

When assessing a sufficiency of the evidence claim on habeas review, the Court may not re-weigh evidence or redetermine witness credibility. *Marshall*, 459 U.S. at 434. The Court presumes the correctness of the facts relied upon by the Michigan Court of Appeals; Petitioner has not rebutted that presumption.  The evidence establishing Petitioner's intent was plentiful and, as set forth by the Michigan Court of Appeals, sufficient to sustain the conviction.  Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

### 2.    Assault With Intent to Murder Barretta Epperson and Joseph Ball

Next, Petitioner argues that insufficient evidence was presented to sustain his convictions for assault with intent to murder Barretta Epperson and Joseph Ball. Petitioner argues that the evidence showed only that he and his cohorts attempted only to terrorize Epperson and Ball, not to kill them.  In support of this claim, he again cites to the fact that many bullets were fired, but only one struck the vehicle.

Under Michigan law, the elements of "assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the

14

killing murder." *People v. Plummer*, 581 N.W.2d 753, 759 (1998). The

actual-intent-to-kill element does not need to be proved by "direct, positive, or

independent evidence." *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 7 (1985)

(internal quotation marks omitted).  Rather, the intent may be shown by inference from

any fact in evidence, provided that the inference is reasonable. *Id.* at 8.

The Michigan Court of Appeals rejected Petitioner's argument, holding, in

relevant part:

> [T]he evidence demonstrated that Johnson shot a gun 11 times at this car,
> striking it once.  Johnson inquired of his companions if he should shoot
> prior to doing so and received an affirmative response.  Prior to this,
> Johnson and his cohorts, without provocation, identified Joseph Ball and
> targeted the car.  These facts support the reasonable conclusion that Johnson
> was trying to kill when he shot at the car.  A person may have the intent to
> kill without directing it at any particular victim. []  From these facts, a
> rational juror could conclude beyond a reasonable doubt that Johnson
> intended to kill persons in the car.

*Johnson*, 2009 WL 3931057 at *6.

The Court finds Petitioner's argument that poor marksmanship evidences an

absence of intent to kill entirely unpersuasive.  The testimony presented was

overwhelmingly sufficient for a finding that Petitioner had the requisite intent.  Thus, the

Michigan Court of Appeals' decision was not an unreasonable application of *Jackson*.

15

### 3.      Assault With Intent to Murder Davonte Barnes

Petitioner was convicted of the assault with intent to murder Davonte Barnes under an aiding and abetting theory.  "To establish that a defendant aided and abetted a crime, a prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or knew that the principal intended to commit the crime at the time he gave aid and encouragement."  *Riley v. Berghuis*, 481 F.3d 315, 322 (6th Cir. 2007), *citing People v. Carines*, 460 Mich. 750 (Mich. 1999).  An "aider and abettor's state of mind may be inferred from all the facts and circumstances.  Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime."  *People v. Carines*, 460 Mich. 750, 758 (Mich. 1999). "The quantum of aid or advice is immaterial as long as it had the effect of inducing the crime."  *People v. Lawton*, 196 Mich. App. 341, 352 (Mich. Ct. App. 1992).

Cameron Evans testified that Jhirnea Harris spotted someone he believed to be Cruz Hinds hiding under a van.  Petitioner produced a gun, racked it, and gave it to Harris.  Evans testified Harris then fired approximately 20 to 30 gunshots through and under the fan.  When Harris returned, he said that he had been shooting at Devonte Barnes.  Barnes testified that he escaped the shooting by jumping a fence and fleeing to a nearby house.  Police found a total of 22 shell casings near the van.  There was evidence

16

that Harris shot at the van from multiple directions.  Harris testified that he was shooting

at Barnes.  Relying on the foregoing testimony, the Michigan Court of Appeals held that a

rational juror could conclude beyond a reasonable doubt that Harris intended to kill

Barnes and that Johnson aided and abetted in the killing.  *Johnson*, 2009 WL 3931057 at

*7.  This Court concludes that the Michigan Court of Appeals' decision that sufficient

evidence was presented to find Petitioner guilty under an aiding and abetting theory  did

not "result[] in a decision that . . . involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  Petitioner is not entitled to federal habeas corpus relief with respect

to this claim.

### 4.     Conspiracy to Commit Murder

Finally, Petitioner claims that insufficient evidence was presented to sustain his

conviction for conspiracy to commit murder because the intent element was not proven

beyond a reasonable doubt.  Under Michigan law, "[a] conspiracy is an agreement,

expressed or implied, between two or more persons to commit an unlawful criminal act."

*People v. Weathersby*, 204 Mich. App. 98, 111 (Mich. Ct. App. 1994).  It must be

established that each of the conspirators had the intent required for murder and, "to

establish that intent, there must be foreknowledge of that intent."  *People v. Hammond*,

187 Mich. App. 105, 108 (Mich. Ct. App. 1991) (citation omitted).  "[D]irect proof of the

conspiracy is not essential; instead, proof may be derived from the circumstances, acts,

and conduct of the parties."  *People v. Justice*, 454 Mich. 334, 347 (Mich. 1997).

17

The Michigan Court of Appeals denied this claim, holding, in relevant part:

> The evidence at trial indicates that Johnson and his cohorts had been driving around the Saginaw area shooting at identified targets.  They discontinued the assaults for a period of time, only to return to shoot and kill the one-year-old victim.  As they were driving, one of Johnson's cohorts identified a person of interest to the group, Joseph Ball, and asked the group's driver to follow the car in which Ball was riding.  They caught up to this car and then one of Johnson's cohorts, Daviaro Barrera, gave him a gun and told him to shoot.  Reasonable inferences drawn from the evidence [] establish the intent to kill, at the end of if not throughout the shooting rampage, for each member of Johnson's group.

*Johnson*, 2009 WL 3931057 at *6.

The Michigan Court of Appeals concluded that viewing the evidence in this matter in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found that Petitioner and his cohorts possessed the intent to kill.  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

In sum, the Court finds that the state court's analysis of these offenses in light of the record evidence constitutes a proper application of the *Jackson* standard of review. There is no basis for concluding that Petitioner is entitled to habeas relief on the ground that the state failed to prove his guilt.

### B.  Limitations on *Voir Dire*

18

In his last habeas claim, Petitioner argues that the trial court placed unfair restrictions on the scope of *voir dire* when it did not allow him to question potential jurors about their occupations and the occupations of their spouses.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. Const. amend. VI.  The right to an impartial jury is made applicable to the states by the Fourteenth Amendment.  *Turner v. Louisiana*, 379 U.S. 466 (1965).  Jury *voir dire* "is designed 'to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors.'"  *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003).

"No hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling v. United States*, __ U.S. __, 130 S. Ct. 2896, 2917 (2010), *citing United States v. Wood,* 299 U.S. 123, 145-146 (1936) ("Impartiality is not a technical conception.  It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.").  "The Constitution . . . does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).  Nevertheless, "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."  *Id.*  Supervision of *voir dire*, for the most part, is left to a trial court's "sound discretion."  *Ristaino v. Ross*, 424 U.S. 589, 594 (1976), *quoting Connors v. United States*, 158 U.S. 408, 413 (1895).  The exercise of the trial court's discretion is "subject to the essential demands of fairness."

19

*Aldridge v. United States*, 283 U.S. 308, 310 (1931). "The Constitution requires only that *voir dire* be conducted in a manner which ensures fundamental fairness." *Dennis*, 354 F.3d at 524.

The Michigan Court of Appeals held that the trial court's questioning was sufficient to determine whether any juror was potentially biased, noting that the jury questionnaires provided occupational information for some of the jurors and that, even after the trial court limited questioning, Petitioner was permitted to clarify one juror's response regarding her occupation. The petitioner had an adequate opportunity to question the prospective jurors. He has not shown that the restrictions placed on him during *voir dire* impeded his right to exercise peremptory challenges or to discover and eliminate biased jurors. The Court therefore concludes that the state court's decision was not contrary or an unreasonable application of Supreme Court precedent.

## V. Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to

20

deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)

(citation omitted).  In this case, the Court concludes that reasonable jurists would not

debate the conclusion that the petition fails to state a claim upon which habeas corpus

relief should be granted.  Therefore, the Court will deny a certificate of appealability.

### VI.  Conclusion

Accordingly, **IT IS ORDERED** that petition for a writ of habeas corpus and a

certificate of appealability are **DENIED** and the matter is **DISMISSED WITH**

**PREJUDICE.**

**IT IS FURTHER ORDERED** that leave to proceed on appeal *in forma pauperis*

is **DENIED** as an appeal cannot be taken from this Opinion and Order in good faith.

FED. R. APP. P. 24(a).

s/Gerald E. Rosen⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Chief Judge, United States District Court

Dated:  October 22, 2013

I hereby certify that a copy of the foregoing document was served upon the parties and/or
counsel of record on October 22, 2013, by electronic and/or ordinary mail.

s/Julie Owens⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
Case Manager, (313) 234-5135